IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NIKOLA GRUJICH,                        )
                                       )
            Plaintiff,                 )
                                       )
                                       )
      v.                               )  No. 12 CV 7739
                                       )
                                       )
CATAMARAN Inc., a Texas Corporation,   )
                                       )
            Defendant.                 )
                                       )


<u>MEMORANDUM OPINION AND ORDER</u>

In this action, plaintiff Nikola Grujich asserts various claims against defendant Catamaran Inc.,[1] the successor entity to his former employer, SXC Health Solutions, Inc. Plaintiff claims that SXC breached his employment contract; fraudulently obtained plaintiff's signature on a letter agreement purporting to amend his employment contract; and violated the Maryland Wage Payment Collection Law ("MWPCL") or, in the alternative, the Illinois Wage Payment and Collection Act ("IWPCA"). Plaintiff seeks damages, as well as rescission of the letter agreement. Defendant has moved for summary judgment of all of plaintiff's claims and to strike certain declarations on which plaintiff relies in opposition to its motion. Defendant has also moved to strike plaintiff's demand for a jury trial on any

---

[1] Defendant Catamaran is the business entity created pursuant to the July 2, 2012, merger of SXC and Catalyst Health Solutions, Inc.

claims that survive summary judgment. For the foregoing reasons, I grant the motion for summary judgment in part, deny the motion to strike plaintiff's declarations, and grant the motion to strike plaintiff's demand for a jury trial.

I.

Plaintiff began working for SXC as Senior Vice President, Business Development, on January 2, 2012, after SXC acquired his previous employer, HealthTrans, LLC. On March 12, 2012, plaintiff and SXC signed an employment agreement (the "Employment Agreement"), which included provisions relating to plaintiff's compensation and to the severance benefits to which plaintiff would be entitled in the event of his termination under various circumstances.

Section 3.2 of the Employment Agreement, captioned "Employee Performance Bonus," states: "In respect of each calendar year falling within the Employment Period, Employee shall be eligible to earn an incentive compensation bonus, depending upon the achievement of Company and Employee performance objectives (the "Incentive Compensation Bonus"). Pl.'s L.R. 56.1 Stmt., Exh. 1 (Declaration of Nikola Grujich),

Exh 1 [DN 62-1].[2]  This section goes on to explain how this bonus would be calculated. It then provides:

> Notwithstanding the foregoing, for the 12-month period ending May 31, 2012, the Employee shall be eligible for a bonus, based on performance, under the terms of the HealthTran[s] LLC annual bonus plan (the "HealthTran[s] Bonus").  The HealthTran[s] Bonus will be payable in June 2012, subject to Employee's continued employment through the payment date other than for Termination without Cause or Termination Arising Out of a Change in Control.

---

[2] Plaintiff might have facilitated citing to his evidence by alternating between numbers and letters when attaching exhibits that themselves have exhibits, to avoid having to cite, as I have just done, to Exh. 1 of Exh. 1.  More importantly, plaintiff would have been well-advised to ensure that all of the evidence on which he relies is, indeed, to be found in the record, and that it is easy to locate therein.  His citations, for example, to "Park Dep., 80" (Pl.'s SJ Opp. at 8, n. 12) [DN 60], and "Plaintiff's Dep, Exh. 30" (Pl.'s L.R. 56.1 Resp. ¶ 32) [DN 61] are roundly unhelpful, first because they require me to cross-reference the table of contents to his appendix of exhibits to discover which exhibit filed in this case, if any, contains the cited evidence, and second because, in these example as in multiple others, the cited items are nowhere to be found. (To illustrate, although both sides include excerpts of the Park deposition in support of their L.R. 56.1 statements, neither side includes page 80. And it appears from the record that only eleven exhibits were marked during the course of plaintiff's deposition, *see* Deposition of Nikola Grujich at 3:12-4:10 (identifying exhibits), Pl.'s L.R. 56.1 Stmt., Exh. 3 [DN 62-4], so plaintiff's citation to "Plaintiff's Dep, Exh. 30" is a mystery.) Equally unhelpful is plaintiff's citation to certain documents only by Bates number. *See* Pl.'s L.R. 56.1 Resp. ¶ 32 (citing to "CAT01619"). As the Seventh Circuit's oft-cited observation goes, "[j]udges are not like pigs, hunting for truffles buried in [the record]," *Gross v. Town of Cicero*, Ill., 619 F.3d 697, 702 (7th Cir. 2010) (second alteration in original).  I may ignore any facts "that lack direct citation to easily identifiable support in the record." *Id.*

It is undisputed that defendant paid plaintiff a bonus for "the 12-month period ending May 31, 2012," but plaintiff claims that he is entitled to more than he received.

Article V of the Employment Agreement relates to termination and defines six "Triggering Events" whose occurrence would cause plaintiff's employment to terminate. These include, among others, "Termination by the Company Without Cause," and "Termination Arising Out of a Change of Control." Section 5.2, captioned "Rights Upon Occurrence of a Triggering Event," sets forth the benefits to which plaintiff is entitled pursuant to the various Triggering Events.

Section 5.2(c) establishes the "Change of Control Severance Benefit" and provides that these become payable following a "Change of Control," which Section 5.4(e) defines as follows:

> A "Change of Control" shall be defined under this Agreement to mean any of the following occurrences:
>
> …
>
> (ii)    The shareholders of SXC Health Solutions Corp. approve a merger, and such merger is completed, consolidation, recapitalization, or reorganization of SXC Health Solutions Corp. or the Company, a reverse stock split of outstanding voting securities, or consummation of any such transaction if shareholder approval is not sought or obtained, other than any such transaction that would result in at least 75% of the total voting power represented by the voting securities of the surviving entity outstanding immediately after, and as a result of such transaction, being Beneficially Owned by at least 75% of the holders of outstanding voting securities of SXC Health Solutions Corp. immediately prior to the

4

> transaction, with the voting power of each such continuing holder relative to other such continuing holders not substantially altered in the transaction.
>
> …

*Id.*

In April of 2012, SXC senior executives announced that SXC would merge with Catalyst Health Solutions, LLC. In anticipation of this transaction (the "Merger"), senior executives of SXC, including plaintiff, were requested to sign a letter agreement dated April 16, 2012 (the "April 16 Letter"), acknowledging that "the Merger shall not be deemed to constitute a Change in Control for purposes of the Employment Agreement." Plaintiff executed the April 16 Letter on April 24, 2012.

On June 25, 2012, plaintiff was informed that his employment would be terminated on July 2, 2012, which was the Merger's effective date. SXC offered plaintiff a separation agreement consistent with the "Termination Without Cause" provisions in Section 5.2(b) of the Employment Agreement. Plaintiff claims, however, that he is entitled to the greater Change of Control Severance Benefit pursuant to the Termination Arising Out of a Change of Control provisions in Section 5.2(c).

Section 6.4 of the Employment Agreement is captioned "Complete Understanding." This section provides that the Agreement:

> supersedes "any and all prior agreements and understandings relating to the employment of Employee by Company, including without limitation any prior compensation plans or compensation agreements entered into between Employee and the company. Specifically, and other than as expressly provided for herein, this agreement replaces, in its entirety Employee's Health Tran[s] employment agreement dated November 11, 2011…."

*Id.*

Plaintiff asserts that defendant breached the Employment Agreement by paying him a bonus that was less than he was entitled to under Section 3.2, and by refusing to pay him the Change of Control Severance Benefit under Section 5.2(c). In addition, plaintiff claims that defendant fraudulently induced him to sign the April 16 Letter by promising him that doing so would not jeopardize his rights under the Employment Agreement, then asserting the April 16 Letter as a basis for refusing to pay him the Change of Control Severance Benefit. Finally, plaintiff argues that he is entitled to a trial on his claim for payment of earned wages under Maryland's, or, alternatively, Illinois' wage payment statute.

II.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P.

56(c). The moving party bears the burden of demonstrating an absence of genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "This burden has two distinct components: an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party." *Id*. at 330.

The movant's ultimate burden is a stringent one: If "there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn," summary judgment is inappropriate. *Id.* at 331 n. 2 (citations and alterations omitted). *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Nevertheless, when the movant meets its initial burden of production by identifying materials in the record that support a judgment in its favor, the nonmoving party may not rest on mere allegations or denials, but "must set forth specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 322 n. 3. In determining whether a triable dispute exists, I must construe the evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A. <u>Plaintiff's Contract Claims</u>

7

Contract interpretation is ordinarily a matter of law, and if its terms are unambiguous, its meaning is a question for the court. *Brooklyn Bagel Boys, Inc. v. Earthgrains*, 212 F.3d 373, 378, n. 1 (7th Cir. 2000). The parol evidence rule "generally forbids the use in evidence of a prior or contemporaneous agreement or terms not included in the [c]ontract." *Id.* at 380. But under Illinois law, extrinsic evidence "can be admitted to discover the parties' genuine intent when a contract is ambiguous." *Id.*

<u>Change of Control Benefits</u>

Defendant raises three arguments for summary judgment of plaintiff's claim that defendant breached the Employment Agreement by failing to pay him benefits set forth in the Termination Arising Out of a Change of Control provisions: First, that the best evidence available of pre- and post-Merger ownership of defendant's stock establishes that no Change of Control occurred, and that plaintiff has presented no evidence to the contrary. Second, that even if the Merger resulted in a redistribution of defendant's stock ownership that otherwise would have met the Employment Agreement's definition of a Change of Control, the April 16 Letter expressly amended the Employment Agreement to carve the Merger out of that definition. And third, that regardless of whether the Merger amounted to a Change of Control, plaintiff was terminated

8

before the Merger, rather than "following" it, so he is not entitled to Change of Control Severance Benefits in any event.

The thrust of defendant's first argument is that even assuming Catalyst shareholders acquired thirty-three percent of the equity in SXC as a result of the Merger, many of these Catalyst shareholders already owned SXC stock before the Merger, so their acquisition of additional SXC shares effected no change in SXC's ownership. Defendant calculates that because of the "substantial overlapping ownership of shares by large shareholders on both sides of the Merger," the vast majority of SXC's post-Merger shareholders—at least 86.1 percent—were "legacy" SXC shareholders, i.e., they owned stock in SXC before the merger. Accordingly, defendant reasons, SXC's ownership did not "change" by twenty-five percent or more, the minimum required to trigger Change of Control Benefits.[3]

In support of this argument, defendant cites "information from Thomson Reuters, a third-party financial markets information company, regarding the equity ownership positions of institutional shareholders." Def.'s L.R. 56.1 Stmt. 33. At

---

[3] The Employment Agreement identifies this minimum change through negative implication, defining a Change of Control as a merger or other reorganization, "*other than* any such transaction that would result in at least 75% of the total voting power represented by the voting securities of the surviving entity" to remain unchanged before and after the transaction. (Emphasis added).

his deposition, John Perkins, defendant's Vice President of Investor Relations and Business Development, explained that he downloaded data from the Thomson Reuters "portal" about SXC's stock ownership as of June 30, 2012, and about Catalyst's stock ownership as of March 31, 2012. Perkins Dep., 23:3-24:17, Def.'s L.R. 56.1 Stmt., Exh. I [DN 54-9]. Perkins testified,

> I merged the data, organized it by firm name, calculated based on the terms of the transaction and conversion rate per share of Catalyst to SXC to figure out what the ending SXC post-merger shareholder list and ownership is. Then I was able to compare that to the pre-merger SXC shareholder list to identify the potential new holders to SXC through the transaction of the merger with Catalyst.

*Id.* at 28:19-29:3. This analysis culminated in Perkins's one-page summary report (the "Perkins Report"), which Perkins testified supports the conclusion that 86.1 percent of SXC's shares post-Merger were not owned by "new" shareholders. Perkins concedes, however, that the report also reflects that "the voting power of legacy SXC shareholders relative to other legacy SXC shareholders changed as a result of the merger." Perkins Dep., 133:11-24.

Plaintiff argues that the Perkins report is hearsay, and that in any event, it does not establish that no Change of Control occurred. Plaintiff insists that the report is "based on the wrong underlying data," and that because the information "is presented on an intermixed Firm basis and does not show the Funds that actually owned the shares," it does not identify the

"Beneficial Owners" of the shares, as it must for purposes of determining whether the Merger meets the Employment Agreement's definition of a Change of Control.  Plaintiff also seizes on Perkins' acknowledgment that the Merger effected a change in the relative voting power of legacy SXC shareholders—an independent basis for finding a Change of Control under the Employment Agreement.

Defendant is not entitled to summary judgment based on its putative evidence that no Change of Control occurred.  To begin, defendant does not meaningfully respond to plaintiff's hearsay challenge but merely asserts, in the most conclusory fashion, that the Thomson Reuters' data "is admissible as a business record under Fed. R. Evid. 803(6) and/or under Fed. R. Evid. 703 per Mr. Perkins' testimony." Def.'s Reply at 7 [DN 63].  Defendant has made no effort to establish, however, that the Thomson Reuters data qualifies as a business record.  Rule 803(6) provides that

> [a] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, *all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11) [or] Rule 902(12)*

is admissible at trial, even when introduced for the truth of the matter asserted. *Thanongsinh v. Board of Educ.,* 462 F.3d 762, 775-75 (7th Cir. 2006) (emphasis added). Defendant has not identified anyone familiar with the record-keeping practices of Thomson Reuters, or anyone with personal knowledge of how the data were gathered, compiled, or kept, much less has it offered the affidavit of such a person to establish that the records have "sufficient indicia of trustworthiness to be considered reliable." *Id.* at 777 (citation omitted). Moreover, as plaintiff points out, Change of Control Benefits are triggered by changes to the "beneficial" ownership in SXC stock, and defendant has offered no evidence that the ownership data Perkins downloaded from the Thomson Reuters portal reflects which entities "Beneficially Owned" SXC's stock, as that term is used in the Employment Agreement.

Defendant's invocation of Rule 703 is equally without support. Although defendant has apparently identified Perkins as an expert witness in this case, it is clear that plaintiff intends to challenge Perkins' qualifications to testify as an expert on the topic(s) for which he is designated. Whether Perkins will ultimately be allowed to offer expert testimony is an issue for another day. In the meantime, however, the current record provides an insufficient foundation for

concluding that the Thomson Reuters data is admissible under Rule 703.

It is no answer to observe, as defendant repeatedly does, that it is plaintiff who bears the burden of showing that a Change of Control occurred. That may be true at trial, but it does not excuse defendant from either its initial burden of production or its ultimate burden of persuasion at summary judgment. *See Celotex*, 477 U.S. at 330. Defendant insists that plaintiff's evidence is inadequate to raise a genuine factual dispute, arguing that statements SXC made in SEC filings a month before the Merger was consummated, including that "SXC shareholders and former Catalyst stockholders would own approximately 67% and 33% of the outstanding shares of SXC common stock, respectively," were merely forward looking, and that, in any event, those statements did not account for the fact that institutional investors held stock in both companies. Defendant is free to argue, at trial, that these shortcomings prevent plaintiff from establishing that a Change of Control occurred. At this stage, however, plaintiff bears no burden unless defendant first identifies admissible evidence affirmatively showing that it is entitled to judgment.

Defendant's second argument is also flawed. Defendant asserts that the April 16 Letter amended the Employment Agreement to exclude the Merger from the scope of that

agreement's Change of Control provisions. I agree that the April 16 Letter on its face purports to do just that. I agree with plaintiff, however, that the April 16 Letter is unenforceable for lack of mutual consideration.

"Consideration consists of some detriment to the offeror, some benefit to the offeree, or some bargained-for exchange between them." *Doyle v. Holy Cross Hospital*, 708 N.E.2d 1140 (Ill. 1999). Defendant argues that plaintiff benefitted from the April 16 Letter because he "stood to be appreciably enriched, and was appreciably enriched" by it, noting that plaintiff "directly enjoyed" a post-Merger increase in the value of shares he held in Catalyst. Defendant also insists that "the prospect of gains in Plaintiff's equity options [in SXC]," and "the material benefit of continuing employment" from the date of his signature through his termination amount to additional consideration. These arguments do not survive scrutiny.

Defendant points to no evidence that plaintiff ever thought about—much less "bargained" for—any of these putative benefits as things of value he would or might receive in exchange for his agreement to relinquish rights he had previously cemented under the Employment Agreement. The April 16 Letter does not even contain common boilerplate language acknowledging that the agreement was supported by "good and

14

valuable consideration." *Cf. Urban Sites of Chicago, LLC v. Crown Castle* USA, 979 N.E. 2d 480, 486 (Ill. App. Ct. 2012) (consideration sufficient as a matter of law based on contractual acknowledgment of sufficiency). If there is any authority supporting the notion that some unexpected or fortuitous benefit a contracting party realizes as a tangential result of his agreement to abandon his rights may be considered, ex post, sufficient consideration for that agreement, defendant has not identified it.

There is no mystery, however, to defendant's failure to cite authority for its argument that plaintiff's continued employment amounts to adequate consideration for amending the Employment Agreement. On that issue, the law is firmly on plaintiff's side. *See Doyle,* 708 N.E. 2d at 1146 (rejecting a similar argument, noting that the "illusion (and the irony) is apparent: to preserve their right under the economic-separation policy, the plaintiffs would be forced to quit"); *Robinson v. Ada S. McKinley Community Services, Inc*., 19 F.3d 359, 364 (7th Cir. 1994) (continued work must be a "bargained for exchange" to be consideration for modifying employment contract).

Because none of defendant's arguments persuades me that plaintiff's agreement to be bound by the April 16 Letter was supported by adequate consideration, I conclude that defendant cannot rely on that Letter to establish that plaintiff waived

15

any rights he otherwise had pursuant to the Employment Agreement.

Defendant's final argument on the Change of Control issue—that plaintiff was terminated "before" the Merger rather than "following" it—is belied by the record and merits no further discussion.

For all of these reasons, I conclude that defendant is not entitled to summary judgment of plaintiff's claim for Change of Control Severance Benefits as set forth in the Employment Agreement.

<u>The HealthTrans Bonus</u>

Defendant likewise is not entitled to summary judgment of plaintiff's claim that he was underpaid his bonus pursuant to the provisions of Section 3.2. The provisions setting forth plaintiff's entitlement to the "HealthTran[s] Bonus" are ambiguous on their face, and the evidence of their meaning is conflicting.

Defendant argues that the Employment Agreement makes clear that any bonus was wholly discretionary, and reasons that because SXC was free to withhold plaintiff's bonus entirely, plaintiff cannot challenge any amount he received as insufficient. But Section 3.2 nowhere states that plaintiff's bonus is "discretionary." While that is the meaning defendant ascribes to language stating that plaintiff "shall be *eligible*"

16

for a bonus (emphasis added), defendant's interpretation is not beyond dispute. For one, Section 3.2 explicitly identifies the basis for determining plaintiff's eligibility: his "performance, under the terms of the HealthTran[s] LLC annual bonus plan (the 'HealthTran[s] Bonus')." Yet, as defendant is quick to point out, "no document exists that is called the 'HealthTrans bonus plan' or bears any like title." Def.'s SJ Mem., 9 [DN 53]. But the contracting parties presumably meant *something* by the reference to the "HealthTran[s] Bonus." And indeed, Illinois courts generally avoid construing contracts in a way that renders any of its terms nugatory. *See Korte & Luitjohan Contractors, Inc. v. Thiems*, 887 N.E.2d 904, 908 (Ill. App. Ct. 2008 ("a fundamental rule of linguistics and contract law is that every word should be given meaning.") The parties' specific reference to the "HealthTran[s] bonus plan," coupled with their omission of any document or additional terms defining the terms of such a plan, are the kind of "yawning void…that cries out for an implied term" and requires recourse to extrinsic evidence to ascertain the parties' intent. *Moriarty v. Svec*, 164 F.3d 323, 330 (7th Cir. 1998)(original ellipsis).

To support his interpretation that the "HealthTran[s] Bonus" referred to in Section 3.2 was mandatory once certain objective criteria were met, plaintiff points to a spreadsheet

17

that both he and Robert Shofi, HealthTrans's former Senior Vice President of Human Resources, testify sets forth the terms of the "HealthTran Bonus" at the time plaintiff entered into the Employment Agreement. Shofi states that he "was the person who individually designed and had primary responsibility for the HealthTrans Bonus Plan after 2008," and explains that "[p]ursuant to the HealthTrans Bonus Plan, Mr. Grujich was entitled to receive a bonus based exclusively upon the financial results of HealthTrans for the fiscal year." Pl.'s L.R. 56.1 Stmt., Exh. 2 at ¶¶ 5-6 [DN 62-3]. Given the company's financial results, "the calculation of the bonus [was] a mathematical exercise." *Id.* at ¶ 17.

Although defendant has moved to strike portions of Shofi's declaration on the grounds that they contain hearsay and are not based on Shofi's personal knowledge, defendant does not raise these challenges with respect to paragraphs five or six, quoted above, and the challenges are without merit with respect to paragraph seventeen. Because I conclude that these portions of Shofi's declaration are sufficient to raise a genuine factual dispute over the meaning of Section 3.2 of the Employment Agreement, I need not consider whether the additional evidence plaintiff proffers in support of his claim for unpaid bonus payments withstands defendant's evidentiary challenges.

B. Plaintiff's Fraud and Rescission Claims

The fraud theory that emerges both from plaintiff's amended complaint and from his opposition to defendant's motion is that plaintiff was misled into relinquishing his rights under the Employment Agreement by agreeing to sign the April 16 Letter. Because I conclude, however, that the April 16 Letter is unenforceable, plaintiff cannot establish that he suffered any damages as a result of the alleged fraud. For at least this reason, he is not entitled to a trial on this claim.[4]

Furthermore, I agree with defendant that plaintiff has not identified sufficient evidence to enable a reasonable fact-finder to conclude that anyone acting on defendant's behalf made a knowingly false statement of material fact, or that plaintiff reasonably relied, to his detriment, on any such statement. These are necessary elements both of plaintiff's fraud claim and of his claim for rescission. *See Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 881-82 (7th Cir. 2005) (setting forth elements of common law fraud); *23-25 Bldg. Partnership v. Testa Produce, Inc.*, 886 N.E.2d 1156, 1164 (Ill. App. Ct. 2008)

---

[4] In his opposition to defendant's motion, plaintiff disavows any claim that defendant defrauded him with promises of future employment. *See* Pl.'s Opp. at 11 (calling this theory a "misstate[ment]" of his fraud claim," and insisting that "[w]hile it is true that SXC intentionally misled Mr. Grujich into believing that he would not be terminated as a result of the Merger, this is not the basis of his fraud claim.")

(elements of equitable claim for rescission on the basis of fraud and misrepresentation).

The allegedly false statements on which plaintiff bases his fraud claim are: "(1) the April 16 Letter needed to be signed so as not to disrupt the Merger negotiations; (2) the Merger would not be a Change of Control as defined in the Employment Agreement; and (3) the April 16 Letter would not amend or reduce his rights under the Employment Agreement or be used against him." Pl.'s Opp. at 11 [DN 60]. Plaintiff's claim for rescission rests on these same alleged misrepresentations. Plaintiff identifies no evidence, however, to suggest that any SXC employee who allegedly made these statements knew or believed at the time that they were false. Moreover, the only act plaintiff claims he took in reliance on the statements was to sign the April 16 Letter, from which no injury can flow as a matter of law. For all of these reasons, defendant's motion for summary judgment is granted as to plaintiff's claims for fraud and rescission.

## C. State Wage Payment Claims

Defendant seeks summary judgment of plaintiff's claims under Maryland's, or, alternatively, Illinois', wage payment statutes on the following grounds: First, that Maryland's statute is inapplicable because 1) SXC was an Illinois employer that paid plaintiff from Illinois; 2) plaintiff filed suit in

Illinois; and 3) the Employment Agreement contains a choice-of-law provision stating that Illinois law governs "without regard to any choice of law or conflicts of law rules or provisions…irrespective of the fact that Employee may become a resident of a different state." Pl.'s L.R. 56.1 Stmt., Exh. 1, Exh. 1 at Section 6.1 [DN 62.1]. In support, defendant cites *Kunda v. C.R. Bard, Inc.*, 671 F.3d 464, 467-68 (4th Cir. 2011) for the proposition that "Maryland employers may have their employees execute employment agreements designating governing law other than that of Maryland, so long as there is a substantial relationship between the parties and the state whose laws govern and the application of those laws would not contravene fundamental Maryland public policy."

The *Kunda* court applied Maryland law to the question of which state's law governed the plaintiff's claims. Here, however, because plaintiff filed suit in Illinois and my jurisdiction is based on diversity, I apply Illinois' choice-of-law rules. "When a federal court hears a case in diversity, it does not necessarily apply the substantive law of the forum state; rather, it applies the choice-of-law rules of the forum state to determine which state's substantive law applies." *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009) (citing *Klaxon Co. v. Stentor Elec. Mfg.*

21

*Co.,* 313 U.S. 487, 496 (1941)). Defendant's reliance on *Kunda* is thus unhelpful.

Plaintiff's response, however, is less helpful still, making the sweeping statement, unsupported by any authority, that the choice-of-law provision in the Employment Agreement does not preclude the application of another state's statutory law.

Determining which state's law applies to non-contractual claims asserted in conjunction with contract claims governed by a choice-of-law provision is a notoriously complex task, and the parties' cursory treatment of the issue is insufficient to allow me to resolve it with confidence. While their failure on this front is mutual, the burden at this juncture rests with defendant. Accordingly, I decline to foreclose plaintiff's claim under the Maryland statute at this stage.

Defendant likewise fails to persuade me that it is entitled to summary judgment of plaintiff's Illinois statutory claim. Defendant argues that plaintiff is not entitled to recovery under the Illinois Wage Payment and Collection Act because the additional compensation he seeks—both as a Change of Control Severance Benefit and as a HealthTrans Bonus—does not qualify as "earned" under the statute. This issue is inappropriate for resolution as a matter of law, however, in

view of the factual disputes that preclude summary judgment of plaintiff's underlying contractual claims.

### D. Plaintiff's Jury Demand

Defendant has moved to strike plaintiff's jury demand, asserting that none of his claims entitles him to a jury. In response, plaintiff concedes that several of his claims must be tried before the court, but he argues that he is entitled to a jury on his fraud claim and on his statutory claim under Maryland law.

For the reasons explained above, plaintiff's fraud claim does not survive summary judgment. As for his Maryland Wage Act Claim, I agree with defendant that the parties' mutual waiver, in Section 6.7 of the Employment Agreement, of "any right to trial by jury that the Employee or [defendant] may have concerning any matter relating to this Agreement" is broad enough to encompass this claim. Even assuming that Maryland law governs the issue, nothing in plaintiff's response persuades me that this broad contractual waiver is inconsistent with Maryland law. That Maryland law "provides a right to a jury trial for claims brought under" the Maryland statute, as plaintiff argues, does not compel the conclusion that this right cannot be waived, nor do the cases plaintiff cites so hold.

III.

For the foregoing reasons, defendant's motion for summary judgment is granted in part. Judgment is entered in defendant's favor on plaintiff's claims for rescission (Count II) and fraud (Count III). Defendant's motion to strike plaintiff's declarations is denied to the extent it seeks to strike paragraph seventeen of the Shofi Declaration, and is otherwise denied as moot. Defendant's motion to strike plaintiff's jury demand is granted.

**ENTER ORDER:**

Elaine E. Bucklo
United States District Judge

Dated: December 12, 2013